**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3856-18
                A-5278-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

AHMAD J. MUHAMMAD,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Appellant/
Cross-Respondent,

v.

AHMAD J. MUHAMMAD,

      Defendant-Respondent/
Cross-Appellant.

_____

Argued (A-5278-18) and Submitted (A-3856-18)[1]
January 11, 2021 – Decided March 12, 2021

Before Judges Sabatino, Gooden Brown, and
DeAlmeida on A-5278-18.

On appeal from the Superior Court of New Jersey, Law
Division, Middlesex County, Indictment Nos. 17-07-
0820, 18-05-0743 and 18-05-0744.

John P. Flynn, Assistant Deputy Public Defender,
argued the cause for appellant/cross-appellant (Joseph
E. Krakora, Public Defender, attorney; John P. Flynn,
of counsel and on the briefs).

Joie D. Piderit, Assistant Prosecutor, argued the cause
for respondent/cross-respondent (Yolanda Ciccone,
Middlesex County Prosecutor, attorney; Eric M.
Snyder, Assistant Prosecutor, of counsel and on the
brief; Joie D. Piderit, on the briefs).

PER CURIAM

These back-to-back appeals and cross-appeal, which we consolidate solely

for purposes of issuing a single opinion, involve defendant's entry of guilty pleas

to offenses charged in unrelated indictments. In Docket No. A-5278-18, the

State appeals from the July 23, 2019 Law Division order denying its motion to

reconsider enforcing a plea agreement the State rescinded prior to its entry on

the record, which agreement involved the dismissal of charges contained in

_____

[1] A-3856-18 was submitted before Judges Sabatino and Gooden Brown only.

Indictment Nos. 18-05-0743 and 18-05-0744 (743 and 744). In that appeal, the

State raises the following point for our consideration:

> BECAUSE NEW JERSEY COURT <u>RULE</u> 3:9-3(C) EXPLICITLY PROHIBITS A COURT FROM DISMISSING ANY COUNTS OR INDICTMENTS WITHOUT THE CONSENT OF THE PROSECUTOR, THE TRIAL COURT ABUSED ITS DISCRETION BY ENFORCING A PLEA OFFER THAT WAS EXPLICITLY WITHDRAWN WEEKS PRIOR TO BEING ENTERED AND DISMISSING AN ENTIRE INDICTMENT WITHOUT THE STATE'S CONSENT.

In the cross-appeal in Docket No. 5278-18, defendant appeals from the

motion judge's December 11, 2018 decision denying his motion to suppress the

evidence seized following a motor vehicle stop, which evidence formed the

evidential basis for 743 and 744. In that cross-appeal, defendant raises the

following point for our consideration:

> ALL THE EVIDENCE SEIZED FROM THE CAR SHOULD HAVE BEEN SUPPRESSED BECAUSE THE OFFICER IMPERMISSIBLY EXTENDED THE SCOPE OF THE TRAFFIC STOP BEFORE ALLEGEDLY SEEING A GUN.

In Docket No. A-3856-18, defendant appeals from the December 13, 2018

Law Division order denying his pre-sentence motion to withdraw his guilty plea

and the April 4, 2019 conforming judgment of conviction (JOC) imposing the

3

A-3856-18

negotiated sentence in connection with Indictment Nos. 17-07-0820 and 17-07-0821. Defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING [DEFENDANT]'S MOTION TO WITHDRAW HIS GUILTY PLEA PRIOR TO SENTENCING BECAUSE WITHDRAWAL WAS IN THE "INTERESTS OF JUSTICE" UNDER RULE 3:9-3(E).

POINT II

IF [DEFENDANT]'S PLEA IS NOT VACATED, THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE COURT IGNORED MITIGATING FACTORS PRESENT IN THE RECORD AND INAPPROPRIATELY IMPOSED CONSECUTIVE SENTENCES FOR OFFENSES ARISING FROM THE SAME CONDUCT.

For the reasons that follow, in Docket No. A-5278-18, we affirm in both the appeal and the cross-appeal. In Docket No. A-3856-18, we affirm defendant's convictions and sentence but remand solely for correction of the JOC.

I.

A. Docket No. A-3856-18 Overview

4

In Docket No. A-3856-18, on July 20, 2017, defendant was charged in Middlesex County Indictment No. 17-07-0820 with first-degree maintaining a controlled dangerous substance (CDS) production facility, N.J.S.A. 2C:35-4 (count one); third-degree fortifying a CDS production facility, N.J.S.A. 2C:35-4.1(c) (count two); third-degree possession of CDS, namely heroin, with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3) (count three); third-degree possession of CDS, namely marijuana, with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(11) (count four); fourth-degree possession of drug paraphernalia with intent to distribute, N.J.S.A. 2C:36-3 (count five); three counts of second-degree possession of a firearm during a CDS offense, N.J.S.A. 2C:39-4.1(a) (counts six, seven, and eight); and three counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts nine, ten, and eleven). On the same date, July 20, 2017, defendant was charged in Middlesex County Indictment No. 17-07-0821 with three counts of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b), (counts one, two, and three), arising from the same incident.

The charges stemmed from the execution of a search warrant on July 7, 2016, for defendant's person and residence located in Piscataway. The search warrant affidavit submitted in support of the application averred that there was

5

"probable cause to believe" that defendant was "utilizing the [Piscataway] premises . . . to store and distribute . . . methylenedioxymethamphetamine (MDMA)" and sought authorization to seize "[CDS], monies, paperwork, paraphernalia" and other items related to narcotics trafficking. In support, the affidavit detailed an extensive undercover investigation initiated after the affiant received a tip from a confidential informant (CI) about defendant's drug dealing activities.

The affidavit specified that although the CI was "providing information to [law] enforcement for the first time," during the course of the investigation, the CI purchased suspected MDMA "directly from [defendant]" at the residence on three separate occasions. The affiant sought a "no-knock warrant" due to "an elevated risk to officer safety" based on defendant's "extensive criminal history" which included "firearms/weapons related offenses," the CI's observation of defendant repeatedly "display[ing] a handgun" at the residence, and the presence of "surveillance cameras on the exterior of the residence and front door" to detect people approaching.

The search resulted in the seizure of approximately two-and-one-half grams of heroin; over one ounce of marijuana; a .40 caliber handgun with two magazines; a .44 caliber revolver; a 12-gauge shotgun; a stun gun; multiple

boxes of ammunition; a bulletproof vest; assorted drug paraphernalia, including packaging materials, heat sealers, digital scales, a blender; and mail addressed to defendant at the Piscataway residence. No MDMA was recovered.

Defendant was arrested and gave an incriminating statement after he was administered Miranda[2] warnings. In the statement, defendant admitted selling drugs at the Piscataway residence, but not as much as he had in the past. He acknowledged possessing all of the contraband seized from the residence and explained the source of some of the items, particularly the firearms, their location in the house, and the extent of his drug inventory. He stated he moved out of his parents' house and had been renting and living at the Piscataway residence since "December" because he needed more room with his other businesses.[3] Defendant expressly exonerated the other occupants of the residence of any wrongdoing, specifically his brother and his roommate.

On February 9, 2018, defendant entered a negotiated guilty plea to three counts of Indictment No. 17-07-0820: maintaining a CDS production facility (count one); fortifying a CDS production facility (count two); and possession of a firearm for an unlawful purpose (count nine). Under the terms of the plea

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Defendant stated that he had a T-shirt, a photography, and a music business.

agreement, the State agreed to recommend an aggregate sentence of seventeen years' imprisonment, with nine-and-one-half years of parole ineligibility, and move to dismiss the remaining counts of Indictment No. 17-07-0820 as well as Indictment No. 17-07-0821 in its entirety. After entering the plea, defendant, who was not detained at the time, requested an extended sentencing date to get his affairs in order. The trial judge granted defendant's request and scheduled sentencing for June 1, 2018.

However, on March 12, 2018, defendant filed a pro se motion and supporting brief to withdraw his guilty pleas, claiming "ineffective counsel, lack of evidence[,] and probable cause among other things." Notably, in his pro se submission, defendant did not assert his innocence. Defendant was assigned new counsel who submitted a brief and supporting certification "assert[ing defendant's] innocence" and detailing legal challenges and defenses overlooked by prior counsel but uncovered during her investigation of the case. Specifically, defense counsel explained that defendant had a reasonable basis to challenge the probable cause underlying the issuance of the search warrant based on the unreliability of the CI and the absence of independent corroboration. Further, according to defense counsel, the fact that defendant did not own the residence as well as the fact that other residents and business invitees had

"access to the premises where drugs and weapons were located" would "support a defense to the charges."

Additionally, defense counsel asserted defendant had "a reasonable basis" to "challenge his understanding of the [Miranda] warnings" that preceded his confession as well as the knowing and intelligent nature of his guilty plea based on "a learning disability that impacts [defendant's] ability to comprehend and process information appropriately." In support, defense counsel provided a June 12, 1996 neuropsychological examination conducted when defendant was twenty-two years old in connection with his participation in the intensive supervision program (ISP) on unrelated charges. While the evaluation found defendant's "general reasoning and thinking capacity [to be] good," defendant was diagnosed with a "Learning Disorder Not Otherwise Specified" based on a "[v]erbal-memory deficit."

Following oral argument, the judge denied the motion and entered a memorializing order on December 13, 2018. In an oral opinion rendered on December 11, 2018, the judge analyzed each of the four factors enunciated in State v. Slater, 198 N.J. 145, 157-58 (2009): "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4)

whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused."

As to the first Slater factor, after reviewing the "statements . . . made by other people in support of th[e] application," the judge determined there was no "competent evidence" establishing that other people had the ability to exercise "ownership or . . . control" over the contraband. Thus, the judge rejected defendant's claim that the "mere presence" of other individuals at the residence amounted to a colorable claim of innocence. The judge also noted that "[c]ourts generally evaluate a colorable claim of innocence by determining whether it raises a legitimate dispute for the jury to decide," not legal issues such as those implicated in defendant's challenge to the search warrant or the voluntariness of his confession.

Turning to the second Slater factor, the judge acknowledged that "defendant would likely satisfy this factor if he [could] make a plausible showing of a valid defense against the charges and credibly explain why an otherwise legitimate defense was overlooked during the plea colloquy." However, the judge rejected defendant's claim that his challenge to the search warrant satisfied the second prong, explaining that the supporting affidavit detailing "three controlled buys" by the CI directly from defendant established

the requisite probable cause for the issuance of the warrant. See State v. Sullivan, 169 N.J. 204, 217 (2001) ("The two controlled drug purchases, as well as the additional police corroboration of the informant's tip, sufficiently demonstrated probable cause . . . to obtain the [search] warrant."); State v. Keyes, 184 N.J. 541, 556 (2005) ("Although no corroborating fact, by itself, conclusively establishes probable cause, a successful controlled buy typically will be persuasive evidence in establishing probable cause.") (citations and internal quotation marks omitted). Moreover, according to the judge, defendant's two-year delay in challenging the search warrant weighed against him.

As to the third Slater factor, the judge acknowledged that "this factor should [not] be given great weight in the balanc[ing] . . . process" because "the vast majority of criminal cases are resolved through plea bargains." Additionally, the judge was satisfied that "the plea was entered into freely, knowingly, voluntarily, and intelligently" and rejected defendant's contention that the 1996 neuropsychological examination undermined the validity of defendant's plea. On the contrary, the judge explained that based on his "clear recollection that . . . defendant understood everything that was going on during the plea" as well as an "independent evaluation of the [plea] transcript,"

11

a [twenty]-year-old evaluation [was] not adequate to overcome the presumption that the [c]ourt's determination based on its ability to observe . . . defendant enter the plea in February of 2018 and making the determination that it was voluntarily made [was] incorrect. More importantly, . . . defendant's own statement at the plea hearing show[s] that he adequately understood the nature of the plea and the proceedings.

Regarding the fourth and final <u>Slater</u> factor, because the judge could not find "that there [would be] any meaningful prejudice to the State or . . . unfair advantage to . . . defendant if the plea was vacated," the judge determined "the fourth prong . . . would weigh in [defendant's] favor." Nonetheless, "based on the totality of the circumstances," the judge concluded "that the reasons to not vacate the plea . . . far outweigh[ed] the reasons advanced to vacate the plea." "Ultimately, '[the judge] believe[d] that th[e] application to vacate the plea [was] nothing more than . . . buyer's remorse.'"

Following the denial of the plea withdrawal motion, over defense counsel's objection, the prosecutor requested that defendant be sentenced that day. The judge denied the prosecutor's request and postponed the sentencing to allow defense counsel to submit a sentencing memo. On March 25, 2019, defendant was sentenced in accordance with the plea agreement, and this appeal followed.

B. Slater Issues

On appeal, defendant argues the judge mistakenly exercised his discretion in "weigh[ing] factors one and two" of the Slater test.  According to defendant, "there were viable grounds to challenge the probable cause supporting the search warrant" and "seek suppression of all the evidence," as well as "evidence that other people . . . liv[ed] in" and "visited the [Piscataway] residence" to establish "shared access" where "[s]ome of the contraband was recovered."  Defendant continues that "[w]hen judged under the liberal standard governing pre-sentencing withdrawal motions, these defenses were colorable" and his ineffective assistance of counsel claim "credibly showed why these potential defenses were overlooked" by prior counsel.

Unquestionably, "[a] more relaxed standard applies to plea-withdrawal motions made before sentencing" than after sentencing.  State v. Munroe, 210 N.J. 429, 441 (2012).  "Before sentencing, a 'defendant shall be permitted to withdraw' a guilty plea if 'the interests of justice would not be served by effectuating the [plea] agreement.'"  Ibid. (alteration in original) (quoting R. 3:9-3(e)).  "In such cases, 'courts are to exercise their discretion liberally to allow

13

plea withdrawals,'" and "[i]n a close case, the 'scales should usually tip in favor of defendant.'" Ibid. (quoting Slater, 198 N.J. at 156).

"However, [l]iberality in exercising discretion does not mean an abdication of all discretion, and, accordingly, any plea-withdrawal motion requires a fact-specific analysis[.]" Id. at 441-42 (first alteration in original) (citations and internal quotation marks omitted). Thus, "[o]n appellate review, the issue is whether the trial court properly exercised its discretion at the time it denied the withdrawal motion," and an abuse of discretion only arises "when 'there has been a clear error of judgment.'" Id. at 443, 448 (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).

In a plea withdrawal motion, the defendant bears the burden of establishing and demonstrating "'a plausible basis for his request' and a good-faith basis for 'asserting a defense on the merits.'" Id. at 442 (quoting Slater, 198 N.J. at 156). In evaluating the first Slater factor, "[a] colorable claim of innocence is one that rests on 'particular, plausible facts' that, if proven in court, would lead a reasonable factfinder to determine the claim is meritorious." Munroe, 210 N.J. at 442 (quoting Slater, 198 N.J. at 158-59). While "[i]t is more than '[a] bare assertion of innocence,' . . . the motion judge need not be convinced that it is a winning argument because, in the end, legitimate factual

14

disputes must be resolved by the jury." Ibid. (quoting Slater, 198 N.J. at 158). However, the trial judge must still distinguish between "a colorable claim of innocence" and a "bald assertion." State v. Lipa, 219 N.J. 323, 333-34 (2014). Doing so requires a judge to engage in some weighing of evidence to determine whether facts are "credible" or "plausible." Ibid.

As to the second Slater factor, "[t]he nature and strength of a defendant's reasons for withdrawal of a plea will necessarily depend on the circumstances peculiar to the case." Munroe, 210 N.J. at 442. "A defendant will likely satisfy this factor if he can make a 'plausible showing of a valid defense against the charges' and credibly explain why an otherwise legitimate defense was overlooked during the plea colloquy." Id. at 443 (quoting Slater, 198 N.J. at 159-60).

> A court should evaluate the validity of the reasons given for a plea withdrawal with realism, understanding that some defendants will be attempting to game the system, but not with skepticism, for the ultimate goal is to ensure that legitimate disputes about the guilt or innocence of a criminal defendant are decided by a jury.
>
> [Ibid.]

We divine certain principles applicable to the analysis of the first and second Slater factors from our Supreme Court's decisions in Slater, Munroe, and Lipa, where the Court reversed the trial courts' decisions denying the defendants'

respective pre-sentence plea withdrawal motions.  In Slater, the defendant pled guilty to possession with intent to distribute cocaine after police discovered drugs and a scale in a motel room he occupied.  198 N.J. at 152.  Less than two weeks later, Slater sought to withdraw his plea, asserting that he had not rented the motel room; he was just visiting; he was unaware the drugs were in the room; and the drugs did not belong to him.  Id. at 152-53.  Slater's account was supported by the record evidence that the police approached the motel room in search of two white men who allegedly possessed cocaine, but Slater was African American.  Id. at 151-52, 163.  Also, the State failed to disprove Slater's claim that he did not rent the room and was only visiting.  Additionally, Slater asserted his innocence claim both in his pro se plea withdrawal motion and in remarks he made for inclusion in the presentence report.  Id. at 163.[4]

In Munroe, the defendant pled guilty to aggravated manslaughter but supported a self-defense claim with evidence that the victim, "who had robbed him in the past," threatened him with a knife and a parked car blocked the defendant's retreat.  210 N.J. at 445.  A police report confirmed that the deceased

---

[4] Here, although defendant expressed his desire "to make a motion to withdraw his plea" in the presentence report, he never expressly asserted his innocence to the charges.  While he admitted being a "felon" and having "a vest, holster and gun in a book bag," he claimed "he was coerced into saying things about the manufacturing facility and fortified premises."

victim was found with a box cutter in his hand, and the State presented no witness statements contradicting Munroe's claim he had no room to retreat. Id. at 445-47. The Court found Munroe's admission in his initial plea colloquy that he shot the victim at close range was not inconsistent with his later claim of self-defense. Id. at 445. "[N]ot a word that defendant uttered in court during his plea colloquy was inconsistent with either the account that he gave to the probation officer who prepared his presentence report or his sworn testimony when he moved to withdraw his guilty plea." Ibid.

In Lipa, the defendant pled guilty to first-degree aggravated sexual assault. Id. at 326. To support his plea withdrawal motion, he presented photographic evidence of his knee, which was operated on around the time the crime was committed, as well as photographs of the exterior of the subject building, to establish that it was impossible for him to climb into the victim's second-floor bedroom window, as she had alleged. Id. at 333. The Court noted that because the victim asserted that Lipa "was inebriated" when he committed the offenses, "[h]is condition thus would have further hampered his ability to commit the assault in the manner [the victim] described." Ibid. Lipa also presented evidence that "a [Division of Youth & Family Services] investigation

found that [the victim's] previous accusations of sexual assault against [the] defendant and a family friend lacked merit."  Ibid.

"[M]indful that the admissibility and veracity of [the] defendant's evidence ha[d] not been tested," the Court determined "the specific facts that [the] defendant asserted could provide a plausible basis to impeach [the victim's] testimony and cause a reasonable jury to find reasonable doubt as to [the] defendant's guilt."  Id. at 334.  Further, the Court found that the defendant "presented sufficient reasons to support his request for withdrawal" by "claim[ing] that his counsel induced him to plead guilty" and by "offer[ing] some evidence that contradicts the State's charges."  Id. at 335.

We draw from these cases the principle that in order to establish the first Slater factor, evidence corroborating a defendant's claim of innocence must support the claim's plausibility, as does the State's failure to present evidence on easily verifiable facts that would undermine the defendant's innocence claims. Through this lens, we are satisfied defendant's proffer fails to establish the "colorable claim of innocence" standard countenanced in Slater, Munroe, and Lipa.  Defendant also failed to establish the second Slater factor, which "dovetails with his assertion of innocence," and requires a "showing of a valid defense against the charges."  198 N.J at 159-60, 163.  We conclude substantially

for the sound reasons expressed by the judge in his oral decision that defendant failed to show that enforcement of the plea agreement would be contrary to the interests of justice.  Hence, the judge did not abuse his discretion in rejecting defendant's request to withdraw his guilty plea.

C. Sentencing Arguments

In the alternative, defendant argues that his sentence, which was the sentence recommended under the terms of the plea agreement, should be reduced because the judge ignored "mitigating factors supported by the record" and failed to "address[] the Yarbough[5] factors when imposing consecutive sentences."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and "note that appellate courts should not 'substitute their judgment for those of our sentencing courts.'"  State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the]

---

[5] State v. Yarbough, 100 N.J. 627 (1985).

case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"While the sentence imposed must be a lawful one, the court's decision to impose a sentence in accordance with the plea agreement should be given great respect, since a 'presumption of reasonableness . . . attaches to criminal sentences imposed on plea bargain defendants.'" State v. S.C., 289 N.J. Super. 61, 71 (App. Div. 1996) (quoting State v. Sainz, 107 N.J. 283, 294 (1987)).

"The plea agreement can appropriately be considered and weighed in the decision to impose consecutive sentences." Ibid. "That said, a trial court is expected to give 'a separate statement of reasons for its decision to impose consecutive sentences.'" State v. Molina, 168 N.J. 436, 442 (2001) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). Certain considerations govern a trial court's decision to impose consecutive sentences, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims; [and]

(e) the convictions for which the sentences are to be imposed are numerous.

[State v. Molina, 168 N.J. 436, 441-42 (2001) (quoting Yarbough, 100 N.J. at 644).]

Here, the judge found aggravating factors three, six, and nine based on defendant's extensive prior criminal record in both New Jersey and New York. See N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that . . . defendant will commit another offense"); N.J.S.A. 2C:44-1(a)(6) ("[t]he extent of . . . defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"); and N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring . . . defendant and others from violating the law"). According to the judge, defendant's record exhibited "criminal behavior . . . throughout his adult life," including three indictable and two municipal court convictions in New Jersey alone for both violent and non-violent offenses for which defendant served multiple prison terms.[6]

The judge also determined there were no mitigating factors, rejecting defendant's reliance on mitigating factors four, nine, and eleven. See N.J.S.A.

---

[6] The State "bargained away its right to seek a mandatory extended term [under N.J.S.A. 2C:43-6(f)] as a part of its negotiated plea agreement with defendant." State v. Courtney, 243 N.J. 77, 88-89 (2020).

2C:44-1(b)(4) ("[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense"); N.J.S.A. 2C:44-1(b)(9) ("[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense"); and N.J.S.A. 2C:44-1(b)(11) ("[t]he imprisonment of the defendant would entail excessive hardship to the defendant").

Notwithstanding the overwhelming aggravating factors and dearth of mitigating factors, the judge found that the plea agreement was "fair and reasonable" and sentenced defendant in accordance with its terms. The judge imposed a twelve-year term of imprisonment, with a seventy-two-month period of parole ineligibility, on count one; a consecutive five-year term of imprisonment with a forty-two-month period of parole ineligibility, on count nine;[7] and a concurrent flat five-year term of imprisonment on count three.

In imposing a consecutive sentence, the judge explained:

> As to [c]ount [nine], the sentence is to be consecutive . . . . [I]n this case, [c]ount [one] deals with the issue of packaging and distribution of a [CDS]. The harm to society is obviously the continued illegal proliferation of drugs and has a significant negative impact on society.

---

[7] The sentence imposed on count nine was the minimum legally authorized sentence. See N.J.S.A. 2C:43-6(c).

As to [c]ount [nine], that deals with handguns and this crime deals with the danger that is posed to society for the possession of handguns by persons not trained to handle a handgun or not licensed to possess a handgun.  So, the harm to society between [c]ount [one] and [c]ount [nine] are significantly different.  The dates of the offense[s] are different.  The nature of the crimes are different and the harm to society is different.  So as a result, this fits precisely into the definition of how this [c]ourt reads the Yarbough criteria.

Defendant argues that because the proffered mitigating factors were supported by his "history of substance abuse," "documented cognitive limitations," and "significant back problems," as well as "character letters reflecting . . . [his] positive attributes," the judge erred in "fail[ing] to fairly consider" them.  However, our caselaw does "not require . . . that the trial court explicitly reject each and every mitigating factor argued by a defendant" particularly when "we can readily deduce from the sentencing transcript" that the judge "was mindful of and did consider the mitigating factors urged for defendant."  State v. Bieniek, 200 N.J. 601, 609 (2010).

Here, based on the judge's finding of the applicable aggravating factors, we discern no abuse of discretion in the judge's rejection of the proffered mitigating factors.  See id. at 610 (noting that the applicability of aggravating factor three undermines a finding of mitigating factor nine); State v. Ghertler, 114 N.J. 383, 390 (1989) (rejecting "defendant's contention that his drug

23

dependency should be considered a mitigating factor"); State v. Wilson, 421 N.J. Super. 301, 312 (App. Div. 2011) (upholding the trial court's determination that mitigating factor eleven based on a medical condition was inapplicable in the absence of any evidence that satisfactory medical treatment was unavailable in prison).

Defendant also contends the judge abused his discretion by imposing consecutive sentences on counts one and nine. While we agree that, contrary to the judge's statement, the dates of the offenses were the same, we are nonetheless satisfied that the imposition of a consecutive sentence comports with Yarbough and is supported by the judge's finding that the crimes have different objectives and inflict different harms upon society. Indeed, the Yarbough factors "should be applied qualitatively, not quantitatively" and "a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences." State v. Carey, 168 N.J. 413, 427-28 (2001).

Applying our deferential standard of review, we are satisfied that the judge's findings are amply supported by the record, that the sentence comports with the guidelines enunciated in the Code of Criminal Justice, and that the aggregate sentence does not reflect an abuse of discretion or shock our judicial conscience. However, because the judgment of conviction incorrectly recites

the sentence,[8] we remand for the JOC to be corrected to reflect the oral sentence pronounced by the judge. See State v. Abril, 444 N.J. Super. 553, 564 (App. Div. 2016) ("In the event of a discrepancy between the court's oral pronouncement of sentence and the sentence described in the [JOC], the sentencing transcript controls and a corrective judgment is to be entered.").

## II.

A. Docket No. A-5278-18 Overview

In Docket No. A-5278-18, on May 11, 2018, while Indictment Nos. 17-07-0820 and 17-07-0821 were still pending, defendant was charged in Middlesex County Indictment No. 18-05-0743 with first-degree unlawful possession of a weapon, a .45 caliber handgun, N.J.S.A. 2C:39-5(b), 2C:39-5(j) (count one); fourth-degree unlawful possession of a weapon, a buck knife, N.J.S.A. 2C:39-5(d) (count two); third-degree possession of CDS, oxycodone, N.J.S.A. 2C:35-10(a)(1) (count three); fourth-degree possession of CDS, hashish, N.J.S.A. 2C:35-10(a)(3) (count four); third-degree possession of CDS

---

[8] Contrary to the oral sentence, the JOC states as follows: on count two, defendant is sentenced to a five-year term of imprisonment with a forty-two-month period of parole ineligibility "to run consecutive to the sentence imposed on [c]ount [one,]" and, on count nine, to a five-year term of imprisonment with a forty-two month period of parole ineligibility "to run concurrent to the sentence imposed on [c]ounts [one and two]."

A-3856-18

with intent to distribute, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(3) (count five); second-degree possession of a firearm while engaged in drug distribution, N.J.S.A. 2C:39-4.1 (count six); third-degree receiving stolen property, a .45 caliber handgun, N.J.S.A. 2C:20-7 (count seven); and fourth-degree possession of handgun ammunition, N.J.S.A. 2C:58-3.3 (count eight). On the same date, May 11, 2018, defendant was charged in Middlesex County Indictment No. 18-05-0744 with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count one), and fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a) (count two), arising from the same incident.

The charges arose from a motor vehicle stop conducted on February 21, 2018, twelve days after defendant pled guilty to offenses charged in Indictment No. 17-07-0820 and was awaiting sentencing. During the stop, police seized a handgun and other contraband from defendant's vehicle. As a result of the new charges, defendant was detained. Defendant moved to suppress the evidence seized during the February 21 motor vehicle stop, and the judge conducted an evidentiary hearing on October 12 and December 11, 2018, after which the judge denied the motion in an oral decision placed on the record on December 11, 2018.

On the same date, December 11, 2018, the judge denied defendant's motion to withdraw his guilty plea in connection with Indictment No. 17-07-0820 and scheduled sentencing on that indictment as well as a status conference on the new indictments for January 25, 2019. The prosecutor indicated on the record that in the interim, she would e-mail the new plea offer on the new indictments to defense counsel as the prior offer had expired with the adjudication of the suppression motion.

When the parties appeared on January 25, 2019, defense counsel requested an adjournment of the sentencing on Indictment No. 17-07-0820 because defendant had "a doctor's appointment" with "a pain specialist" scheduled for February 1, 2019, at the county jail to address his "serious back issues." Defense counsel explained that after a long wait, defendant had finally obtained "approval" for a specialist to evaluate him at the jail and he would miss his appointment if he was sentenced because he would be transferred to the custody of the Department of Corrections. Over the State's objection, the judge acknowledged that the "delay" in resolving Indictment No. 17-07-0820 was attributable to "defendant wanting to vacate his guilty plea," but granted the adjournment request, finding no "meaningful prejudice . . . to the State by

delaying the sentencing a little bit in order for the doctor's appointment to occur as scheduled."

Turning to the new indictments that are the subjects of this appeal, defense counsel indicated that defendant had accepted the State's offer, had signed the paperwork, and was prepared to resolve the cases in accordance with the agreed upon terms. According to defense counsel, those terms required defendant to plead guilty to count one of Indictment No. 18-05-0744 in exchange for a sentencing recommendation of five years' imprisonment, with a five-year period of parole ineligibility, to run consecutive to his sentence on Indictment No. 17-07-0820, and dismissal of count two of Indictment No. 18-05-0744 as well as Indictment No. 18-05-0743 in its entirety.

However, because the judge had granted defendant's request to adjourn the sentencing on Indictment No. 17-07-0820, the State indicated that it was rescinding the plea offer on Indictment Nos. 18-05-0743 and 18-05-0744 on the ground that the offer contemplated "the resolution" of all the cases that day. Defense counsel protested that under the terms of the plea agreement, "[t]here was no stipulation . . . that [defendant] had to be sentenced today." Acknowledging that during "a conference in chambers," the prosecutor stated "that the plea offer was contingent upon the matter being globally resolved

28

today," the judge directed defense counsel to "file [a] motion to enforce the plea agreement" and permitted the prosecutor "to put under [her] signature" on the plea form, "offer rescinded by State."

On March 11, 2019, defendant filed a motion to enforce the plea agreement on Indictment Nos. 18-05-0743 and 18-05-0744, which the State opposed. The parties appeared on March 25, 2019, for sentencing on Indictment No. 17-07-0820 and oral argument on the motion. The judge granted defense counsel's request for an adjournment of the motion but proceeded to sentence defendant on Indictment No. 17-07-0820.

Thereafter, oral argument on the motion was conducted on May 24, 2019, during which the parties placed their respective positions on the record. Defendant asserted that "once the plea form was signed" by all the parties, which execution occurred before the conference in chambers regarding a global resolution, there "was an enforceable contract" and "the condition of when sentencing was to occur [was] ancillary to that contract" and "[was] not a material element of the contract." Further, defendant argued that "there [was] no provision under the caselaw or the rules that allow[ed] the State to rescind its offer once it[] entered into an agreement."

A-3856-18

The prosecutor countered that there was no enforceable agreement because by requesting an adjournment of the sentencing on Indictment No. 17-07-0820, defendant reneged on "a material term" of the agreement. When asked by the judge why the sentencing on other charges "was so essential to the State," the prosecutor responded:

> Resources. My office has limited resources. The more times that we have to come back, the more files that we have to carry, the more times we have to be prepared for trial, it's a zero[-]sum game. That means it's to the exclusion of some other file or some other matter we can be doing.

Further, for the first time, the prosecutor stated that if defendant's motion was granted, "the State would[ not] participate . . . in th[e] plea," and "would not consent to any dismissals of anything." Thus, according to the prosecutor, any dismissals would be in violation of Rule 3:9-3(c), which "explicitly [states that] the [c]ourt does not have the authority to dismiss any counts without the State's permission."

Following oral argument, the judge granted defendant's motion in an order entered May 24, 2019. In an oral decision on the record, initially, the judge posited that the issue was whether the condition of setting the date for sentencing on other charges was "an ancillary issue or as argued by the State, . . . a material issue" so much so that "if the [c]ourt were to excise out the sentencing date," the

30

"material terms of the plea[ agreement]" would be "alter[ed.]"  The judge found that "the material terms" of the plea agreement were "what . . . defendant [was] pleading guilty to and what the recommended sentence of the State would be" which, "under all the facts and circumstances," the judge deemed "fair and reasonable."  Further, the judge concluded that "the condition of the sentencing date [was] ancillary to the . . . terms of the contractual agreement."  Moreover, according to the judge, "judicial efficiency and overall fairness" militated in favor of enforcing the plea agreement.

In expressly rejecting the State's proffered reason for attempting to condition the plea on the sentencing on other charges, the judge explained:

> [M]uch of the [State's] reason for wanting to bring this matter to closure had to do with the frustration of the protracted nature of this process, and the [c]ourt can fully understand that in light of what has transpired procedurally with this case . . . .
>
> However, ultimately, the [c]ourt feels as though frustration with the process or the length that it takes is part of what we do in this court system, and sometimes things just do take longer because of an emphasis to always do what is right.
>
> . . . .
>
> The prosecutor also argues that the court date is to promote the effective use of limited prosecutor resources.  Once again, the [c]ourt struggles with that line of thinking because there seems to be then a greater

31

use of prosecutor resources if the matter is . . . returned to the trial calendar.

In addition, the [c]ourt looks at the issue of judicial efficiency. And clearly in this case, the substantive terms . . . were agreeable to both the State and . . . defendant.

See State v. Warren, 115 N.J. 433, 443 (1989) ("The [plea bargaining] system enables a defendant to reduce penal exposure and avoid the stress of trial while assuring the State that the wrongdoer will be convicted and punished, and that scarce and vital judicial and prosecutorial resources will be conserved through a speedy resolution of the controversy.").

The judge then conducted a plea hearing during which defendant entered a guilty plea pursuant to the terms of the plea agreement, which was accepted by the judge in accordance with Rule 3:9-2. However, the State refused to participate in the plea colloquy and thereby withheld its consent to the anticipated dismissal of charges as required under the plea agreement at sentencing. Acknowledging the State's argument raised for the first time during oral argument on the motion that Rule 3:9-3(c) precluded the court from dismissing charges without the consent of the prosecutor, the judge suggested that the State should seek reconsideration of the motion based on the newly

raised legal argument or seek interlocutory relief from the Appellate Division prior to the scheduled sentencing date.

Thereafter, the State moved for reconsideration. On July 22, 2019, during oral argument, the State reiterated its prior arguments that under Rule 3:9-3(c), the court was not authorized "to dismiss any of the counts that the aborted plea would require." The judge denied the motion in an order filed on July 23, 2019. In an oral opinion on the record, the judge found that the State failed to meet the "high standard" for reconsideration because "the State . . . has not presented any evidence that the decision was palpably incorrect or irrational." See State v. Puryear, 441 N.J. Super. 280, 294 (App. Div. 2015) (explaining that reconsideration is only available when "either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." (quoting Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010))).

Further, the judge concluded that

> [Rule 3:9-3(c)] does not apply when the dismissal of the charges was pursuant to a negotiated plea agreement. Rather, it appears as though this rule was intended for a situation where the [c]ourt acts unilaterally and especially if there's no legitimate basis for it.

33

> In this case, the [c]ourt did not act unilaterally to dismiss charges, but rather acted pursuant to . . . the plea agreement that the [c]ourt finds was a valid plea agreement . . . .
>
> So that, even though the State is disagreeing that the agreement is enforceable, once the [c]ourt found that it is enforceable, the [c]ourt then [i]s authorized to dismiss the other charges because th[at] was a material term to the plea agreement.[9]

The judge then sentenced defendant in accordance with the terms of the plea agreement and dismissed count two of Indictment No. 18-05-0744 as well as Indictment No. 18-05-0743 in its entirety. In the conforming judgment of conviction entered on August 22, 2019, the judge noted that in order "to insure that both the appeal rights of the State and . . . [d]efendant [were] fully preserved regarding decisions made in this matter," the consecutive sentence imposed on Indictment No. 18-05-0744 was not to be served until defendant "completed his sentence on Indictment No. 17-07-0820 to allow any direct appeals to be filed and considered by the Appellate Division."

B. State's Appeal of Enforcement of Plea Agreement

---

[9] The judge also noted that an evidentiary hearing "to make findings of fact [was] not necessary" because "the plea agreement itself [was] the contract" that determined "the terms of the plea agreement." The plea form included in the record corroborates the judge's reasoning.

On appeal, the State argues that "[b]ecause no case in New Jersey . . . has ever countenanced enforcing a plea offer that was explicitly rescinded prior to its entry" and "because the trial court failed to abide by the applicable court rule that circumscribes the role trial courts may take in plea negotiations," the State's motion for reconsideration should have been granted and the plea vacated. Defendant counters that as a threshold matter, "[t]he State's appeal must be dismissed for lack of jurisdiction." In support, defendant relies on Rule 2:3-1 which "limits the State's right of appeal to . . . narrow circumstances to comport with the Double Jeopardy Clauses." Defendant asserts that Rule 2:3-1 does "not authorize the State's appeal from the order denying reconsideration of the trial court's decision to enforce the plea agreement" when the State failed to seek interlocutory review under Rule 2:5-6(a) "before the matter became final" with the imposition of "a legal sentence."

Substantively, defendant asserts that "[i]n accordance with due process and contract-law principles, the trial court correctly exercised its discretion to enforce the plea agreement" because "[a]llowing the State to repudiate a signed, written plea agreement based on unwritten, immaterial terms would offend due process, frustrate the legitimate expectations of defendants, and weaken the plea-bargaining system." Further, according to defendant, enforcing the

agreement "under the circumstances of this case did not run afoul of [Rule 3:9-3(c)]."

Preliminarily, we reject defendant's contention that the State's appeal must be dismissed for lack of jurisdiction. Rule 2:3-1 governing appeals by the State in criminal actions allows the State to "appeal or where appropriate, seek leave to appeal pursuant to [Rule] 2:5-6(a)," from "a judgment of the trial court dismissing an indictment, accusation or complaint, where not precluded by the constitution of the United States or of New Jersey." R. 2:3-1(b)(1). In the past, we have entertained the State's appeal from trial court orders dismissing indictments without seeking leave of court. See, eg., State v. Salley, 264 N.J. Super. 91, 93 (App. Div. 1993) ("The State appeals from the Law Division's order dismissing an indictment . . . . because the State refused to comply with an order requiring the police to disclose the identity of a confidential informant."); State v. Childs, 242 N.J. Super. 121, 125 (App. Div. 1990) ("The State appeals from an order in which the trial judge dismissed this three-count State grand jury indictment charging thefts, on the ground that a deputy attorney general infringed upon the grand jury's independent judgment."); State v. Merlino, 153 N.J. Super. 12, 14-15 (App. Div. 1977) ("The State appeals from the order of the Assignment Judge of Mercer County dismissing the indictment

as to all defendants because of the denial of the constitutional right to a speedy trial.").  Here, because the reconsideration order relates back to the judge's order to enforce the plea agreement, including the attendant dismissals, the practical effect of the order is the dismissal of an indictment.

We also find that defendant has suffered no deprivation of his constitutional rights as a result of the State's appeal.  The Double Jeopardy Clause states no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  Our "state constitutional double jeopardy protection is coextensive" with the federal doctrine.  State v. Cooper, 307 N.J. Super. 196, 201 (App. Div. 1997).  In United States v. Scott, 437 U.S. 82, 96, 99 (1978), the Court explained that although "a defendant once acquitted may not be again subjected to trial without violating the Double Jeopardy Clause," that situation is "a far cry from" circumstances where a criminal defendant sought and obtained the dismissal of charges "against him on a basis unrelated to factual guilt or innocence of the offense of which he is accused."

New Jersey courts have consistently applied this same principle, even in circumstances where a defendant has gone to trial, a jury has been impaneled, and charges have then been dismissed on grounds unrelated to guilt or

innocence. See, eg., State v. Brito, 345 N.J. Super. 228, 230 (App. Div. 2001) (holding that where trial court's dismissals of criminal complaints "were, in no sense, a disposition on the merits of the charges" but rather "on procedural grounds only," the State was "entitled to appeal" under Rule 2:3-1); State in Interest of S. Z., 177 N.J. Super. 32, 36 (App. Div. 1981) ("[A] defendant who chooses to seek termination of proceedings against him on a basis unrelated to factual guilt of the offense of which he has been accused cannot claim injury cognizable under the double jeopardy concept if the government is permitted to appeal from such a ruling . . . ."); State v. Barnes, 84 N.J. 362, 371 (1980) ("Where the proceedings against an accused are terminated during trial on a basis unrelated to factual guilt or innocence, the State may appeal from a ruling of the trial court in favor of the defendant without offending the principles expressed in the double jeopardy clause."). Indeed, "[t]he mere commencement of a case does not automatically entitle a defendant to a bar of further prosecution." S.Z., 177 N.J. Super. at 36. Rather, "[f]airness and reasonable expectation in the light of constitutional and common law goals should control, not technicalities." Ibid.

Additionally, although defendant may face a harsher sentence if the State prevails in its appeal, "the critical inquiry in assessing whether principles of due

process and double jeopardy bar imposition of a sentence greater than one initially imposed is whether the defendant maintains a legitimate expectation of finality with respect to the sentence." State v. Haliski, 140 N.J. 1, 21 (1995) (internal quotation omitted). "Finality interests arise after the 'final judgment and commencement of the sentence.'" State v. Thomas, 459 N.J. Super. 426, 433 (App. Div. 2019) (quoting State v. Veney, 327 N.J. Super. 458, 461 (App. Div. 2000)).

Here, defendant has not commenced serving the sentence at issue. In fact, the judge explicitly preserved both the State's and defendant's appeal rights by noting in the JOC that defendant would not serve the sentence in this case until he had completed serving the sentence imposed on Indictment No. 17-07-0820, which has not yet occurred. See State v. Rodriguez, 97 N.J. 263, 270 (1984) ("[T]he commencement of sentence coupled with the defendant's expectation of finality in his original underlying conviction and sentence combined to raise a constitutional bar against an increase in that sentence." (citing State v. Ryan, 86 N.J. 1, 9-10 (1981))). Moreover, since the underlying conviction is itself the subject of attack by virtue of defendant's cross-appeal, in which he seeks invalidation of the seizure of the evidence upon which the charge is predicated, "no legitimate expectation of finality could be invested in the underlying

conviction[] or the sentence[] related to [it]." Id. at 271. See United States v.

Jerry, 487 F.2d 600, 606 (3d Cir. 1973) ("[W]here a defendant by his own motion

causes the withdrawal of his guilty plea, he has waived his right not to be put in

jeopardy a second time.").

Turning to the substantive argument, the State asserts the judge violated

Rule 3:9-3, which provides in pertinent part:

> (a) Plea Discussions Generally. The prosecutor and defense attorney may engage in discussions relating to pleas and sentences and shall engage in discussions about such matters as will promote a fair and expeditious disposition of the case, but except as hereinafter authorized the judge shall take no part in such discussions.
>
> (b) Entry of Plea. When the prosecutor and defense counsel reach an agreement concerning the offense or offenses to which a defendant will plead on condition that other charges pending against the defendant will be dismissed or an agreement concerning the sentence that the prosecutor will recommend, or when pursuant to paragraph (c) the defendant pleads guilty based on indications by the court of the maximum sentence to be imposed, such agreement and such indications shall be placed on the record in open court at the time the plea is entered.
>
> (c) Disclosure to Court. On request of the prosecutor and defense counsel, the court in the presence of both counsel may permit the disclosure to it of the tentative agreement and the reasons therefor in advance of the time for tender of the plea or, if no tentative agreement has been reached, the status of negotiations toward a

plea agreement. The court may then indicate to the prosecutor and defense counsel whether it will concur in the tentative agreement or, if no tentative agreement has been reached and with the consent of both counsel, the maximum sentence it would impose in the event the defendant enters a plea of guilty, assuming, however, in both cases that the information in the presentence report at the time of sentence is as has been represented to the court at the time of the disclosure and supports its determination that the interests of justice would be served thereby. If the agreement is reached without such disclosure or if the court agrees conditionally to accept the plea agreement as set forth above, or if the plea is to be based on the court's conditional indication about the sentence, all the terms of the plea, including the court's concurrence or its indication concerning sentence, shall be placed on the record in open court at the time the plea is entered. Nothing in this Rule shall be construed to authorize the court to dismiss or downgrade any charge without the consent of the prosecutor.

[R. 3:9-3(a) to (c).]

"A plea agreement is . . . governed by contract-law concepts." State v. Pennington, 154 N.J. 344, 362 (1998). "It requires a meeting of the minds upon the negotiated pleas and is an executory agreement since it depends on the approval of the sentencing court." State v. Smith, 306 N.J. Super. 370, 383 (App. Div. 1997).

The essence of a plea agreement is that the parties agree that defendant will plead guilty to certain offenses in exchange for the prosecution's recommendation to dismiss other charges and suggest a certain sentence,

41

> all subject to the right of the court to accept or reject the agreement in the interest of justice.
>
> [State v. Means, 191 N.J. 610, 622 (2007).]

Under basic contract law principles, "[w]hen two parties reach a meeting of the minds and consideration is present, the agreement should be enforced." Ibid.

While our court Rules expressly authorize a defendant to move to withdraw a negotiated guilty plea, and we review the trial court's decision on such an application for abuse of discretion, Munroe, 210 N.J. at 443, "[o]ur Rules do not contain a corresponding right of the State to withdraw from a plea agreement." Means, 191 N.J. at 620. Nonetheless, "[i]n proper circumstances the State may withdraw its agreement after the defendant has accepted," Smith, 306 N.J. Super. at 383, including, for example, when "the prosecutor placed on the record" that the agreement was contingent on the sentencing court's acceptance of the plea of multiple defendants and a criminal history report showing no prior indictable convictions. Id. at 381-82. Significantly, in Smith, "[e]ach defendant also signed and initialed a plea form indicating that the plea was based on no prior convictions and contingent on the plea of the co-defendant." Id. at 382. We held there was no error in the sentencing court's refusal to enforce the plea agreement when both defendants failed to meet a specific condition of its terms. Id. at 383.

However, in <u>Means</u>, our Supreme Court held that when "[v]alid consideration exists to support the agreement," a "unilateral mistake made by the prosecutor, standing alone," is insufficient "to invalidate the plea agreement." <u>Id.</u> at 622. There, the mistake made by the prosecutor was the failure to notify the victims of the plea agreement prior to making the plea offer to defendant in violation of "the victims' statutory rights and the Attorney General's guidelines." <u>Id.</u> at 620. After finding "that basis insufficient to vacate the plea agreement," the Court concluded the trial court erred in "grant[ing] the State's motion to set aside the plea agreement." <u>Id.</u> at 613, 622. <u>Cf.</u> <u>State v. Veney</u>, 327 N.J. Super. 458, 459, 461 (App. Div. 2000) (noting that "there is no reason why the State should not be permitted to withdraw [a plea] offer" before sentencing based on "an honest mistake" in the calculation of the authorized <u>Brimage</u>[10] plea offer but dismissing the State's appeal of the denial of its plea withdrawal motion on double jeopardy grounds because the defendant had "commenced serving the sentence").

Relying on <u>Means</u>, in <u>State v. Conway</u>, 416 N.J. Super. 406, 411 (App. Div. 2010), we held that the defendant had a right to enforce a plea agreement "according to its terms, without implying unstated terms favorable to the State

---

[10] <u>State v. Brimage</u>, 153 N.J. 1 (1998).

and unfavorable to the defendant." In Conway, "[t]he written plea form, signed by defendant and the prosecutor, did not list any special conditions set by either side" and "[a]t no point during the plea hearing did the prosecuting attorney indicate that the State was conditioning its acceptance of defendant's plea agreement on the co-defendants entering into plea agreements." Id. at 408-09.

However, a month after the trial judge in Conway accepted defendant's plea agreement, "when one of the co-defendants opted to go to trial," the State moved to vacate the agreement, contending "that the plea deal was conditioned on all defendants pleading guilty," and the judge granted the State's motion "over defendant's vigorous objection." Id. at 409-10. We reversed, holding that "the written plea agreement did not state any conditions that would give the State the right to withdraw from the deal," and "[i]n the absence of any such explicit condition, defendant had a right to enforce the plea agreement." Id. at 412-13. See also State v. Salentre, 242 N.J. Super. 108, 111-12 (App. Div. 1990) (reversing the trial court's decision to vacate a plea agreement based on the "unarticulated premise" that the agreement was conditioned on all defendants accepting a plea bargain).

Guided by these principles, we are satisfied that the judge properly enforced the plea agreement based on the explicit terms of the agreement.

A-3856-18

Although the State maintains that the plea agreement was contingent on sentencing taking place on and no later than January 25, 2019, no such provision was included in the written agreement executed by both parties. Had such a term been included and defendant still requested an adjournment of the sentencing, without question, the State would have been entitled to rescind the plea agreement based on defendant breaching a material term of the agreement. See Conway, 416 N.J. Super. at 411 ("Where we have permitted the State to withdraw from a plea agreement, that relief was premised on the explicit terms of the agreement.").

We acknowledge the prosecutor's representation on the record that "the resolution was to get everything resolved today." However, defendant vehemently disagreed, asserting that "[t]here was no stipulation on this plea agreement that he had to be sentenced today," and, significantly, no such term was contained in the duly executed agreement. The judge's recollection from the in-chambers conference that "the plea offer was contingent upon the matter being globally resolved today" does not mandate a contrary outcome. In fact, the judge's recollection has no bearing on the issue given Rule 3:9-3(a)'s prohibition against courts taking any part in plea negotiations except as authorized under Rule 3:9-3(c), which does not apply here. See also State v.

Williams, 277 N.J. Super. 40, 47-48 (App. Div. 1994) ("What the trial court clearly may not do . . . is participate in plea negotiations" or "tender a plea offer."). To give weight to the judge's representation regarding a contract term absent from the plea agreement that the defense denied was a condition of the agreement would be contrary to court rules and case law.

The State also argues that there was no enforceable agreement because it rescinded the plea offer before it was accepted on the record. Although the rules contemplate both a plea "agreement" and the "enter[ing]" of a plea by the defendant on the record, the text of the rules clearly indicate that the "agreement" and the "enter[ing]" are two separate legal events. See R. 3:9-3(b) ("When the prosecutor and defense counsel reach an agreement . . . such agreement . . . shall be placed on the record in open court at the time the plea is entered."); R. 3:9-2 (conditioning the court's acceptance of a guilty plea on "questioning the defendant personally[] under oath" and "determining . . . that there is a factual basis for the plea and that the plea is made voluntarily, . . . and with an understanding of the nature of the charge and the consequences of the plea"). The significance of the schism is that while there must be both an enforceable "agreement" and the "enter[ing]" of a plea in order for the agreement to be effective, the former exists separate and apart from the latter. While the

46

latter is the subject of court rules, the former is governed by contract principles. Pennington, 154 N.J. at 362.

Applying contract principles, when defendant accepted the State's offer as evidenced by the completion and execution of the plea form, containing both defendant's signature and the signature of the prosecuting attorney as well as the material terms of the agreement, an enforceable agreement was formed subject to the entering and the court's acceptance of the plea on the record. Means, 191 N.J. at 612-13. Thus, the State was not justified in relying on an "unstated term[]" that was not memorialized in the four corners of the agreement to rescind the plea offer after it was accepted by defendant but before it was formally entered on the record. Conway, 416 N.J. Super. at 411. See State v. Rosario, 391 N.J. Super. 1, 15 (App. Div. 2007) ("[W]e see no basis in law or equity to hold that the [State's plea] offer was unenforceable merely because it was not placed in writing before it was accepted."); see also State v. Chappee, 211 N.J. Super. 321, 324 (App. Div. 1986) (affirming the judge's refusal to enforce a plea agreement that was "rescinded" by the State "before it was put on the record and before [the defendant] accepted or rejected it").

To hold otherwise under the idiosyncratic circumstances of this case would jeopardize defendant's constitutional rights and would be unfair to

47

defendant. "[A]lthough notions of fairness apply to each side, the State as well as the defendant, the defendant's constitutional rights and interests weigh more heavily in the scale." Warren, 115 N.J. at 443. "Due process concerns as well inhibit the ability of the prosecutor to withdraw from a guilty plea." Id. at 445. See State v. Antieri, 186 N.J. Super. 20, 25 (App. Div. 1982) (affirming the judge's refusal "to order specific performance of the rejected plea agreement" after it was entered on the record because "[t]here [was] nothing in the record which indicate[d] that there was any impropriety in the prosecutor's withdrawal of the plea agreement" and the judge's reasons supported "his rejection of the proposed plea agreement as well"). Notably, defendant presented to the judge a legitimate need to attend a long-awaited medical appointment, while the prosecutor asserted concerns of mere inconvenience in returning on a later date.

We also reject the State's contention that the judge violated Rule 3:9-3(c) by dismissing charges without the State's consent. Rule 3:9-3(c) applies to situations where "the judge does not react favorably to the 'tentative agreement' or the maximum sentence acceptable to defendant for the offense to which defendant offers a plea." Salentre, 275 N.J. Super. at 419-20. Rule 3:9-3(c) did not apply here. The judge did not take part in the "plea discussions," "modify[ a] guilty plea . . . or fashion[ a] disposition . . . when there [was] no basis to

accept the plea offered." Id. at 419 (quoting State v. Barboza, 115 N.J. 415, 422 (1989)). Instead, because there was an enforceable negotiated plea agreement, once the plea was entered on the record and accepted by the judge as fair and reasonable, the judge properly dismissed the remaining count of Indictment No. 18-05-0744 as well as Indictment No. 18-05-0743 in its entirety at sentencing as contemplated under the express terms of the agreement. Accordingly, we discern no abuse of discretion in the judge's denial of the State's motion for reconsideration in this distinctive setting. See State v. Washington, 453 N.J. Super. 164, 187 (App. Div. 2018) (reviewing the trial court's denial of reconsideration for "abuse of discretion").

C. Defendant's Cross-Appeal of the Denial of the Suppression Motion

In the cross-appeal, defendant argues the judge erred in finding "the plain view exception to the warrant requirement" justified "the discovery of the handgun" because the officer "had unlawfully extended the traffic stop without reasonable suspicion" and "thus was not lawfully in the viewing area when he allegedly saw the gun." According to defendant, the other items seized "should also have been suppressed as fruit of the poisonous tree."

At the suppression hearing conducted on October 12 and December 11, 2018, Piscataway Township Patrolman Robert Yulich testified that while on

routine patrol at approximately 3:00 a.m. on February 21, 2018, he observed defendant fail to stop at a stop sign and fail to use a turn signal. He also observed defendant "swerve[] over the fog line,"[11] "fail . . . to stop at the red light," turn "without signaling" on two more occasions, almost crash into a barrier, and exceed the speed limit. Yulich then activated his lights and siren, which also activated his mobile video recorder (MVR),[12] and pulled defendant over after "notif[ying] Dispatch of a motor vehicle stop."

With the spotlight from his patrol car shining on defendant's vehicle, Yulich first approached on the "passenger side of the vehicle," tapped on the window, and asked defendant for his "license, registration, and . . . insurance card." Initially, defendant gave Yulich "his entire wallet" but then removed "a [S]tate [identification card]" from the wallet and handed it to Yulich while "he continued looking for the [other] documents." Suspecting that defendant was an unlicensed or impaired driver, Yulich moved to "the driver's side of the vehicle" where defendant handed him "a Walmart receipt" and a rental agreement for the vehicle.

---

[11] "The fog line is a solid white line on the right-hand side of the road."

[12] The MVR was admitted into evidence and viewed by the judge during the hearing.

A-3856-18

At that point, because defendant had "bloodshot, watery eyes," which are indicators of impaired driving, Yulich asked defendant "for the vehicle's keys" so that he could not "drive . . . away." While defendant "leaned to the right" to look for the keys,[13] "his left leg lifted up" and Yulich observed "part of a handgun barrel sticking out from under [defendant's] leg." Yulich recognized the gun from his experience as a police officer as well as prior experience in the military.

Without informing defendant of his observation, Yulich tried to open the driver door, but it was locked. Yulich then ordered defendant to open the door and exit the vehicle. However, when defendant repeatedly "reach[ed] for the handgun," Yulich "told [defendant] to keep both hands on [the] steering wheel." Once another officer arrived to assist Yulich, defendant was removed from the vehicle and escorted to the patrol car. After defendant was out of the car, Yulich observed a "full-sized, double-action handgun on the driver's seat" with "ball ammunition inside the magazine" and "a round of ammunition . . . in the chamber" in the "ready[-]to[-]fire" position. Before seizing the handgun, Yulich photographed it "in place without touching it." The photograph was admitted into evidence at the hearing.

---

[13] The car had "a push[-]to[-]start" ignition.

An ensuing search of "[t]he interior cabin" uncovered "[a] large buck knife" in "a compartment" in "the driver's door," and "a mason jar" with "suspected marijuana" as well as "a pill bottle" with suspected "Oxycodone" in "the center console." Defendant remained in the patrol car until the search of the interior of his vehicle was completed, at which point defendant was arrested and transported to police headquarters for processing. The entire encounter lasted approximately forty-five minutes. Defendant's car was also impounded and a subsequent search pursuant to a search warrant revealed vials of marijuana oil in a bag in the trunk. In addition to the weapons and drug possession related charges, defendant "was charged with numerous motor vehicle summonses" on the same day as the stop.

Following the hearing, the judge denied the motion, concluding that the stop was justified based on "the motor vehicle violations," and the search was justified under "the plain view doctrine." In an oral decision, the judge found Officer Yulich's testimony "very credible" and made factual findings consistent with his testimony as well as "the [c]ourt's observations of the MVR." Initially, the judge determined that "between the testimony and the . . . MVR, the stop itself for the motor vehicle infractions was clearly legitimate." Next, the judge found that "based . . . on the interaction that transpired" after the stop, which

52

caused the officer "to suspect . . . [that] defendant was under the influence while . . . operating the vehicle," "the officer properly went to the driver['s] side" and "was lawfully in the location" when, "based on his training and experience," he observed "in plain view" "what he believed to be a gun."

In rejecting defendant's argument that the officer prolonged the stop unnecessarily, the judge concluded "the length of th[e] [stop] . . . was not unreasonable to taint the actions of the officer." Rather, the judge found that "the interaction itself [was] very quick," "[i]t was part of the routine motor vehicle stop with suspicion of . . . [driving while under the influence,]" and "it was further delayed because there [were] issues as to whether . . . defendant[,] in fact[,] was impaired and whether his license was valid." The judge noted that the officer's failure to conduct field sobriety tests was understandably preempted by his observation of the handgun.

The judge also found that the search of the interior cabin was lawful under the automobile exception to the warrant requirement because "probable cause to believe that the vehicle contained evidence of a crime . . . arose in a manner that was unforeseeable and spontaneous" and the subsequent search warrant was not tainted by any illegality during the initial stop and search. See State v. Witt, 223 N.J. 409, 450 (2015) ("Going forward, searches on the roadway based on

probable cause arising from unforeseeable and spontaneous circumstances are permissible.").

"When reviewing a trial court's decision to grant or deny a suppression motion, [we] 'must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record'" and "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Ibid. (citing State v. Hathaway, 222 N.J. 453, 467 (2015)).

"A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement," State v. Cooke, 163 N.J. 657, 664 (2000), and "[t]he State bears the burden of proving that the warrantless search is justified by one of those exceptions." State v. Gamble, 218 N.J. 412, 425 (2014). Evidence seized when found in plain view following a lawful traffic stop is one such exception. State v. Gonzales, 227 N.J. 77, 82 (2016). To be lawful, a traffic "stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty,

170 N.J. 632, 639-40, modified, 174 N.J. 351 (2002)). Here, Yulich properly stopped defendant's vehicle based on him observing numerous traffic infractions and defendant does not argue otherwise.

During a lawful traffic stop, a police officer is permitted to "inquire 'into matters unrelated to the justification for the traffic stop,'" Dunbar, 229 N.J. at 533 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)), and "may make 'ordinary inquiries incident to [the traffic] stop.'" Ibid. (alteration in original) (quoting Rodriguez v. United States, 575 U.S. 348, 355 (2015)). "If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" State v. Dickey, 152 N.J. 468, 479-80 (1998) (alteration in original) (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir. 1995)).

The inquiries, however, "may not be performed 'in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" Dunbar, 229 N.J. at 533 (quoting Rodriguez, 575 U.S. at 355). Thus, a detention following a lawful stop "must be reasonable both at its inception and throughout its entire execution," State v. Coles, 218 N.J. 322, 344 (2014), and prolonging a traffic stop "beyond the time reasonably required to

55

complete the . . . stop's purpose . . . is unlawful absent independent reasonable suspicion of criminal activity." Dunbar, 229 N.J. at 536.

In determining "whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Dickey, 152 N.J. at 477 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). "The standard of reasonable suspicion required to uphold an investigative detention is lower than the standard of probable cause necessary to justify an arrest," State v. Nishina, 175 N.J. 502, 511 (2003) (citation omitted), and "must be based on the law enforcement officer's assessment of the totality of the circumstances with which he [or she] is faced." Ibid. (quoting State v. Davis, 104 N.J. 490, 504 (1986)). Indeed, it "is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126-27 (2002) (citation omitted).

Here, the seizure was based on the officer's plain view observation of the handgun during the course of the traffic stop. A warrantless seizure of evidence in plain view is justified when "a police officer is lawfully in the viewing area and the nature of the evidence is immediately apparent" as evidence of a crime or contraband. Gonzales, 227 N.J. at 82. The record reveals substantial credible

evidence supporting the judge's fact-findings, see State v. Elders, 192 N.J. 224, 243-44 (2007), and his determination that the handgun was properly seized because it was in plain-view is legally sound.

Defendant contends that the officer was not "lawfully in the viewing area when he allegedly saw the butt of the handgun underneath [defendant]" because at that point, the officer had "moved to the driver's side of the car" and "had impermissibly extended the traffic stop by failing to diligently address the traffic infractions." To be sure, a detention becomes unlawful when it is longer than is reasonably necessary to diligently investigate an officer's reasonable suspicion of criminal activity. Dickey, 152 N.J. at 476-79. However, "diligence [is] gauged . . . by noting what the officer actually did and how he did it[.]" Rodriguez, 575 U.S. at 357. Here, we agree with the judge that, based on the interaction between the officer and defendant during the stop, the officer acted diligently and did not prolong the stop beyond what was necessary to satisfy his suspicions. Accordingly, we affirm the judge's order denying the suppression motion.

Affirmed in Docket No. A-5278-18 on the appeal and cross-appeal; and, in Docket No. A-3856-18, defendant's convictions and sentence are affirmed but we remand solely for correction of the JOC.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

57

A-3856-18